UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| **CHARLES ROBERT STOUT** | : | **CIVIL ACTION NO. 22-6036** |
| **VERSUS** | : | **DISTRICT JUDGE_____** |
| **SMITH INTERNATIONAL, INC.,** | : | **MAGISTRATE JUDGE_____** |
| **METROPOLITAN LIFE INSURANCE** | | |
| **COMPANY, NICOLE MARTIN AND** | | |
| **AMY O'CONNER** | | |

*************************************************************************

## COMPLAINT

**NOW INTO COURT**, through undersigned counsel, comes plaintiff **CHARLES ROBERT STOUT ("Stout")**, domiciled in the Parish of Lafayette, Louisiana, who avers:

### DEFENDANTS

1. Made defendants **SMITH INTERNATIONAL, INC. ("Smith"),** as an ERISA Plan Administrator, **METROPOLITAN LIFE INSURANCE COMPANY (MetLife"), NICOLE MARTIN ("Martin")** and **AMY O'CONNER** (O'Conner").

### JURISDICTION

2. This court has jurisdiction pursuant to 28 U.S.C. § 1331 because the claims arise under federal law, specifically under the provisions of 29 U.S.C. 1132 ("ERISA"). Plaintiff **Stout** is empowered to bring a civil action as a participant and/or beneficiary of an ERISA plan sponsored by **SMITH** to recover benefits due to him under the Plan, to enforce his rights under the terms of the plan, and/or to clarify his rights to future benefits under the Plan.

### VENUE & STANDARD OF REVIEW

3. **VENUE.** Venue is appropriate in the Western District of Louisiana under 28 U.S.C. § 1391 as **STOUT** was employed by **PATHFINDER**, a subsidiary of **SMITH**, and was a

participant under the terms of an ERISA plan administered by **SMITH** in the Western District of Louisiana.

**STANDARD OF REVIEW**.  "When an ERISA plan lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial of a claim is limited to assessing whether the administrator abused that discretion. For plans that do not have valid delegation clauses, the Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard." Ariana M. v. Humana Health Plan of Tex., Inc., 884 F.3d 246, 247 (5th Cir. 2018) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)).

The Plan described herein does not have a delegation clause.  Therefore, a denial of benefits challenged by **STOUT** under Section  1132(a)(1)(B) of ERISA is to be reviewed by this Court under a de novo standard, and interpreted in light of the specific terms of the Plan. Further, the Plan specifically provides that after the "Initial Determination" of the Claim and the "Initial Appeal" decision, only the Plan administrator can interpret the Plan and/or determine eligibility under the Plan.

## SMITH INTERNATIONAL, INC. ERISA PLAN

4.  Charles Stout was originally employed as a Field Engineer by Pathfinder, Inc. beginning on or about April 1, 2001, when Pathfinder, Inc. was wholly owned by W-H Energy Services, Inc.   In 2008, Smith International, Inc. ("Smith") acquired W-H Energy Services, Inc., and Pathfinder, Inc. (which became Pathfinder, L.L.C.)  ("Pathfinder"), a wholly owned subsidiary of Smith.   In 2009, Pathfinder employees, formerly W-H Energy Services legacy employees, came under the Smith ERISA plan.  At pertinent times herein, **STOUT** was employed as a Logging While Drilling (LWD) engineer by **PATHFINDER**.  From

approximately 2010 through August 7, 2011, **STOUT**  was eligible and a participant under the terms of an ERISA plan administered by **SMITH**, namely "*The Smith International, Inc. Long Term Disability Plan for All Full Time Rotational Employees*," which included long term disability benefits to the eligible employees.

5.   On or about January 1, 2010, **MetLife** issued a group insurance policy to **Smith** providing insurance coverage for long term disability ("LTD") income. "*The Smith International, Inc. Long Term Disability Plan for All Full Time Rotational Employees*," consisted of a MetLife Certificate of Insurance, Group Policy 100770-G by reference, and other "Additional Information" including provisions concerning applications for Social Security benefits, Medicare Protection, special services, early intervention services, return to work programs, and rehabilitation.  "*The Smith International, Inc. Long Term Disability Plan for All Full Time Rotational Employees*," also included the ERISA information, including the name and address of the Plan Administrator, the Plan Number and Name, Agent for Legal Process.

6.   "*The Smith International, Inc. Long Term Disability Plan for All Full Time Rotational Employees*," included a statement that benefits under the Plan "...are insured by Metropolitan Life Insurance Company."  The Plan stated, "MetLife is liable for any benefits under the Plan."  "Your MetLife Certificate describes the eligibility requirements for insurance provided by MetLife under the plan."  The Plan also provided that claims for disability should be submitted to MetLife in accordance with MetLife claims forms and procedures.

7.   "*The Smith International, Inc. Long Term Disability Plan for All Full Time Rotational Employees*," further provided the following statements, to-wit:

**"Initial Determination"**

"After you submit a claim for disability benefits to MetLife, MetLife will review your claim and notify you of its decision to approve or deny your claim.*** If MetLife denies your claim in whole of in part, the notification of claims decision will state the reason why your claim was denied and reference to the specific Plan provision(s) on which the denial is based."

"**Appealing the Initial Determination**"

"If MetLife denies your claim, you may appeal the decision. *** If MetLife denies the claim on appeal, MetLife will send you a **final** written decision that states the reason(s) why the claim being appealed is being denied and references any specific Plan provision(s) on which the denial is based..  If an internal rule, protocol, guideline or other criteria was relied upon in denying the claim on appeal, the **final** written decision will state the rule, protocol, guideline or other criteria was relied upon in denying the claim on appeal."

8. ***The Smith International, Inc. Long Term Disability Plan for All Full Time Rotational Employees***, further provides that the "Plan administrator and other Plan fiduciaries have full discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan."  The Plan provides, "The Board of Directors of Smith International, Inc. shall be empowered to amend or terminate the Plan or any benefit under the Plan."

9. ***The Smith International, Inc. Long Term Disability Plan for All Full Time Rotational Employees***," does not give MetLife discretion to determine eligibility for LTD benefits subsequent to the "Initial Determination" and "Initial Appeal."  In Fact, the Plan terms provide only for a **final** written decision that states the reason(s) why the claim being appealed is being denied.   In the instant case, the Initial Determination of STOUT's claim was "reversed."

Page 4

## INITIAL MEDICAL DETERMINATIONS

10.   Plaintiff Charles R. Stout graduated from Teurlings Catholic High School in 1998.

Following high school, Stout attended Louisiana Technical College and approximately two years

later in 2000 earned an Associate Degree in Industrial Electronics.   Sometime around 2001,

**STOUT** went to work for **PATHFINDER** (before it was merged with Smith) where he was

employed for over ten (10) years.   **STOUT** left work on August 7, 2011, "due to symptoms

related to Hypertension, Valvular Heart Disease, Aortic regurgitation and Mitral regurgitation /

Congenital Heart Disease."  He also had co-morbid conditions of moderate obesity, and

Dyslipidemia." [1]  During that period of time, **STOUT** was treated by Dr. Esmond Barker [2], a

Board Certified Cardiologist in Lafayette, Louisiana, who advised **STOUT** that he could no

longer lift heavy objects at work, and Dr. Barker imposed lifting and carrying restrictions as

reflected in the STD claims file.  Thereafter, **STOUT** was awarded STD benefits under the Plan

terms for a period of 180 days, the maximum duration for STD benefits.  **SMITH** as

administrator of the Plan paid **STOUT** his full salary during the STD period.  **PATHFINDER**

thereafter refused to waive the Lifting and Carrying responsibilities contained in **STOUT**'s Job

Description.   In fact, the record reflects that the letter dated July 1, 2013, from Melissa Jones, a

claims specialist employed by Metropolitan Life Insurance Company, "***Your claim for long term***

***disability benefits is currently approved because you are disabled from performing your***

***regular occupation.***"   During the period of time from February 6, 2012 and February 21, 2014,

the record contains information indicating  Stout's employer, Pathfinder Energy Services, LLC

(by that time a Schlumberger company) communicated to MetLife that Pathfinder was unable or

---

[1] MetLife Claims Activity File, page 209/336.

[2] Also known as Barker's Cardiovascular Center, LLC.

unwilling to compromise on the requirements of the job description, waive the lifting/carrying

requirements of the specific job, nor accommodate  Stout by providing a him with a job that did

not have such a lifting/carrying requirement.   The record makes several references to MetLife's

inquiry about such job description accommodations, but by correspondence dated August 8,

2012, Pathfinder indicated that the restriction/limitation would <u>not</u> be waived, and no alternate

job or accommodation would be afforded  Stout.[3]

11.   After receiving the maximum 180 days of benefits under the terms of the STD

benefits package, **STOUT** then was awarded and received Long Term Disability (LTD) benefits

under the Smith Plan. [4]  The Long Term Disability (LTD) benefits under the Smith Plan also

provides that <u>AFTER</u> the period of the first 24 months, monthly disability payments are reduced

to 60% of **STOUT**'s Predisability Income at any employment from any employer in his Local

Economy taking into account STOUT' training, education and experience.

## INITIAL CLAIM DETERMINATION BY METLIFE

12.  It has been established judicially that correspondence dated February 21, 2014, from

Metropolitan Life Insurance Company ("MetLife") advised Stout that his claim for long term

disability benefits was to be terminated effective February 5, 2014, "...because you no longer

satisfy the definition of disability your employer's Plan." [5]   Herein the February 21, 2014, letter

from Metropolitan Life Insurance Company ("MetLife") to Stout may sometimes be referred to

---

[3] See MetLife documents Bates No. 120808F10454 regarding permanent lifting
restriction, and lack of sedentary alternative to prior position.

[4] The Plan provides  monthly disability payments of 80% of **STOUT**'s Predisability
Income at his own occupation from any employer in his Local Economy taking into account
STOUT' training, education and experience for a period of 24 months.

[5] "Charles Robert Stout v. Pathfinder Energy Services, LLC et al, Case 6:14-cv-02457-
RTH-CMH, Document 28-3, Exhibit B, Page ID # 312;

as the "***Initial Termination of Benefits Letter***" ("**ITBL**.)"

13.  The MetLife Claims Activity file [6] indicates that on August 3, 2014, the MetLife claims team referred Stout's medical file to the "MetLife Medical Director" for review "who opined the medical on file **does** (emphasis added) support ongoing lift/carry restriction of up to 25 lbs."  The MetLife Medical Director stated in the Claims Activity File,  ***"Although the 2013 ECHO was improved from the 2012 echo, the claimant has moderate AI with LVH and symptoms of shortness of breath, fatigue and chest discomfort on exertion.  I concur with his cardiologist that although the claimant is not yet a surgical candidate, the lifting r/ls are advisable given the exertion related symptoms.  In my opinion, the medical on file supports on going R/L of no lift/carry greater then 25 lbs beyond 2/5/2014 thru the present and ongoing***."  On August 22, 2014, Stout requested an administrative appeal of the Initial Termination of the long term disability benefits. [7]   Appeal of the Initial Termination of benefits on August 22, 2014, included numerous references in the MetLife claims activity file which supported the ongoing restrictions and limitations relating to lifting and carrying. [8]

---

[6]  Met Life Claims Activity File, page 226/336.

[7] "Charles Robert Stout v. Pathfinder Energy Services, LLC et al, Case 6:14-cv-02457-RTH-CMH, Document 28-4, Page ID # 317, Paragraph No. 8.

[8] **Medicals Support Work Restrictions with page number in the MetLife Claims File**

| | |
|---|---|
| 2-3/177 | Dx Aortic valve disorder; medical supported |
| 3-6/177 | Dx in detail; restriction based upon medicals |
| 6-7/177 | EE RTW another position b/c medicals prevent RTW in current occupation |
| 15/177 | EE cannot RTW b/c of heart valve Dx; restriction supported |
| 16-18/177 | Dr. Barker advises no RTW potential b/c of valve disorder |
| 19/177 | Dr. Barker advises Dx supports restrictions |
| 19-21/177 | Medical restrictions prevent RTW; Need vocational rehabilitation. |
| 21/177 | LTD Claims Spec. own assessment notes work restriction |
| 22/177 | Medicals support work restrictions due to valve disorder |
| 23-25/177 | Medicals support work restrictions due to valve disorder; refer to VRC |
| 25-29/177 | Updated Evaluation: Medicals support work restrictions |

| | |
|---|---|
| 30/177 | EE unable to RTW due to aortic valve disorder |
| 31/177 | Dr. Barker advises work restriction to LTD Claims Spec. |
| 32/177 | VRC notes work restriction due to Dx |
| 34/177 | VRC Summary: Medical supports work restriction |
| 40/177 | LTD Claims Spec ref. VRC Summary that medicals support work restriction |
| 43-45/177 | VRC notes work restriction and heart valve problem worsening |
| 45-48/177 | LTD Claims Spec reviews VRC: Dx supports work restriction; Disabled |
| 48-52/177 | LTD Claims Spec. Updated Evaluation: Dx supports work restriction |
| 68-72/177 | LTD Claims Spec Updated Evaluation: Dx supports work restriction |
| 72/177 | SS Spec. DX: aortic valve disorder. EE with worsening VHD and is unable to RTW |
| 87-91/177 | LTD Claims Spec. Updated Eval: Medicals support work restriction |
| 92-95/177 | VRC notes work restrictions based upon updated action plan |
| 98-102/177 | LTD Claims Spec. Action Plan: Medicals support work restriction |
| 105-109/177 | LTD Claims Spec. Action Plan: Medicals support work restriction |
| 111-116/177 | LTD Claims Spec. Action Plan: Medicals support work restriction |
| 120-121/177 | LTD Claims Spec. Transition Review: Dr. Barker Dx aortic valve disorder and work restrictions |
| 121/177 | LTD Claims Spec. Review Claim: Dr. Barker Dx aortic valve disorder and lists work restrictions |
| 122-127/177 | LTD Claims Spec Action Plan: Medicals support work restrictions |
| 128/177 | LTD Claims Spec: EE advises unable to RTW Own Occ due to medical condition causing work restrictions |
| 135-139/177 | LTD Claims Spec Action Plan: Medicals support work restrictions |
| 144-147/177 | VRC Action Plan: Dx aortic valve disorder; functionality restricted |
| 150-/177 | LTD Claims Spec Transition Decision: EE Dx with aortic valve disorder; Dr. Barker recommends work restrictions |
| 157-158/177 | VRC Referral for Assessment: Dx aortic valve disorder; Dr. Barker assessment indicates work restrictions |
| 163-164/177 | LTD Claims Spec: EE advised Dr. Barker restrictions remain in place, Barker sending revised RL form indicating work restrictions |
| 164/177 | LTD Claims Spec: Dr. Barker indicating no lift/carry objects greater than 25lbs |
| 164/177 | LTD Claims Spec: Notes duplicate RL advising of same work restriction |
| 171-172/177 | Unit Leader LTD: EE advised Doctor states same work restrictions; condition improving only b/c of work restrictions |

14.    After the Initial Appeal, MetLife correspondence dated November 5, 2014, from MetLife Appeals Specialist Karen VanAernam advised that based upon the administrative appeal, Stout's claim for long term disability ("LTD") is reinstated retroactively effective February 6, 2014, and "***...the previous claims decision will be reversed..***" [9]

15.    After the Initial Appeal and reversal of the termination of LTD benefits, **STOUT** was subsequently paid arrearages by MetLife of $51,349.86 from the date of the ITBL through February 6, 2014.    The record also reflects that after February 6, 2014 through August 27, 2021, Stout was paid by monthly LTD benefits by MetLife in the amount of $5,705.54 (being equivalent to 60% of **STOUT**'s Predisability income).

16.    MetLife representative Peggy A. Martin wrote by letter dated November 6, 2014, "***The information we received establishes that he [Stout] remains disabled as defined in his employer's group disability plan; therefor, we have reinstated Mr. Stout's claim effective February 6, 2014.***" [10]

17.    The MetLife Claims file references 2013 and 2014 cardiac testing and a notation on September 19, 2014, that MetLife Medical Director Katrina Turner supported the lifting and carrying restrictions recommended by **STOUT**'s treating physician.[11]

18.    After reversal of the Initial Claims Determination and reinstatement on November 6, 2014, **STOUT** continued to timely comply with MetLife's periodic requests for medical

---

[9] "Charles Robert Stout v. Pathfinder Energy Services, LLC et al, Case 6:14-cv-02457-RTH-CMH, Document 28-4, Page ID # 317, Paragraph No. 9; and, Document 28-3, Page ID # 314, Exhibit C.

[10] "Charles Robert Stout v. Pathfinder Energy Services, LLC et al, Case 6:14-cv-02457-RTH-CMH, Document 28-3, Page ID # 315.

[11] MetLife Claims Activity File, page 211/336.

documentation as provided under the terms of the **METLIFE** Certificate.   **STOUT** was paid LTD benefits in the amount of 60% of his Predisability Earnings, or $5,705.54, through September 3, 2021.

19.   The medical conditions of **STOUT** on and prior to September 3, 2021, were essentially the same as his medical conditions on November 6, 2014, the date of his prior reinstatement.   The MetLife Claims file indicates that the MetLife Medical Director considered **STOUT'S** disability permanent.  MetLife Medical Director acknowledged that the physician imposed limitations and restrictions where actually designed to improve **STOUT**'s cardiac condition, and that failing to follow the restrictions would worsen the medical condition..

20.    From November 6, 2014, through and inclusive of September 3, 2021, medical reports and other medical evidence mandated that employment limitations and restrictions placed upon **STOUT** by his treating cardiologist continued and remained.  Plaintiff **STOUT** was to conduct "no carrying or lifting more than 25 lbs." during or in the scope of **any** employment.

### SUBSEQUENT TERMINATION OF LONG TERM DISABILITY BENEFITS

21.   On September 3, 2021, MetLife Claims Specialist **NICOLE MARTIN**, in her correspondence of that date made the following determination to <u>AGAIN</u> terminate LTD benefits under the Plan terms to **STOUT** stating:

> "***We have determined that we are unable to approve benefits on your claim beyond September 5, 2021 because a review of your clinical information suggests that you no longer suffer from a medical condition or combination of conditions of such severity that would warrant the placement of restrictions and/or limitations on your activities at this time.***"

The letter of  **MARTIN** dated September 3, 2021, acknowledged **STOUT** medical information

showed a history of cardiac issues, and that **STOUT**'s treating physician and cardiologist Dr. Esmond Barker continued to place restrictions on **STOUT**'s ability to work at any employment that required lifting and carrying more than 25 pounds.   **STOUT**'s treating physician did not rule out other non-strenuous full-time employment.

22.   On December 16, 2021, **STOUT** timely appealed MetLife's **<u>second</u>** termination of long term disability benefits under the Plan. The appeal letter was accompanied by the following documents and exhibits:

| <u>Exhibit</u> | <u>Description</u> |
|---|---|
| A | Table of Contents for Compact Discs marked as Exhibit B and Exhibit C |
| B | Charles Stout Compact Disc  261109228596   (Records STD Benefits Claim) |
| C | Charles Stout Compact Disc  711203051962 (Records LTD Benefits Claim) |
| D | Smith International Inc. Benefits Plan filed into the judicial record in case by counsel for Metropolitan Life Insurance Company in Docket 6:14:cv-02457-RTH-CMH, " Charles Robert Stout vs. Pathfinder Energy Services, LLC et al., Document 28-2 |
| $D_2$ | Schlumberger Disclosure Statement, filed into the judicial record in case by counsel for Schlumberger Defendants in Docket 6:14:cv-02457-RTH-CMH, "Charles Robert Stout vs. Pathfinder Energy Services, LLC et al., Document 28-3, which identifies the Disability Plan |
| E | February 21, 2014 Termination of Benefits Letter from MetLife |
| F | October 6, 2014 Letter from MetLife Vocational Rehabilitation Consultant Denise Price requesting a Labor Market Survey |
| G | 2014 Labor Market Survey performed by Corvel at the request of MetLife |

H  2014 MetLife Labor Market Survey

I  May 22, 2014 Report of Glenn M. Hebert, MRC

J  November 5, 2014 MetLife Appeal Decision reversing termination of benefits

K  November 6, 2014 MetLife Letter: Charles Stout Remains Disabled

L  2015 Judicially Admitted Facts by MetLife in Docket 6:14:cv-02457-RTH-CMH,

   "Charles Robert Stout vs. Pathfinder Energy Services, LLC et al., Document 28-4

M  MetLife Claim Activity File (excerpts)

N  September 3, 2021 Termination of Benefits Letter from MetLife

O  October 27, 2021 Correspondence from MetLife Claims Specialist Nicole Martin

P  Attending Physician Report from Dr. Barker on MetLife Form July, 2019

Q  Dr. Barker Letter September, 2011

$Q_2$  MetLife Supplemental Attending Physician Statement 9/26/2011

$Q_3$  Dr. Barker Medical Records, 2013, 2015

$Q_4$  Sleep Study 2013

$Q_5$  Social Security Disability Decision and Medical Review

R  Attending Physician Report 10/3/2019

S  Dr. Barker Medical Records 4/9/2021

T  Job Description - Pathfinder LWD Manager/Coordinator

U  Short Term Claims File Review Excerpts

V  Long Term Claims File Review Excerpts through 2014

$V_2$  Additional Long Term Claims File Review Excerpts

W  Disability Benefits Payment History from MetLife

X  Genex Physician Consultant Review - Dr. Stanley Chou

X₂ Cardiology Referral by MetLife

Y MetLife Contracted Investigation Surveillance Reports

In this civil suit, the record should include all documents supplied to **STOUT'S** counsel relating to the claim, including a copy of the electronic **METLIFE** Claim Activity File, Claim No. 711203051962..

23. The appeal letter indicated, "By reference hereto, the documents on the Compact Discs, and all of the Exhibits A through Y, should be designated as and made part of the appellant record."   Attached to the appeal were copies of **Compact Disc (CD) labeled "Charles Stout 261109228596" (Exhibit B) and Compact Disc (CD) labeled "Charles Stout 711203051962" (Exhibit C).**   Hard copies of **Exhibits D through Y** were also attached to the appeal.

24. Additionally, in his appeal letter dated December 16, 2021, **STOUT** objected to the submission of new evidence generated by **METLIFE**, its claims representative **NICOLE MARTIN** and/or its appeal specialist **AMY O'CONNER** subsequent to the termination of benefits letter dated. September 3, 2021. STOUT argued that no evidence generated after September 3, 2021, should form the basis for the decision of **METLIFE**, **NICOLE MARTIN** and **AMY O'CONNER**  to terminate Charles STOUT's long term disability income benefits made on that date, since it was not considered in the LTD benefits termination.

25. In actuality, the  ***Smith International, Inc. Long Term Disability Plan for All Full Time Rotational Employees***, does not provide for a subsequent eligibility determination by **METLIFE**.   After the Initial Appeal, only the Plan Administrator **SMITH** has authority under the Plan terms to make eligibility determinations or interpretations of the Plan subsequent to the Initial Determination and/or Initial Appeal as provided in the Plan.

26.  From November 6, 2014, through and inclusive of September 3, 2021, neither

**SMITH INTERNATIONAL, INC. ("Smith"), as** Plan Administrator and Policyholder of

Group Policy 100770-G, nor **METROPOLITAN LIFE INSURANCE COMPANY**

**(MetLife")**, insurer of Group Policy 100770-G, ever exercised their right(s) under the Plan terms

to have **STOUT** examined by a qualified physician of their choice.

27.  Further, the appeal noted that the reports and records of Dr. Barker, the treating

physician, at all pertinent times, indicate that **STOUT** met the terms of the definition of

"Disability", after the Elimination Period, namely:  **STOUT** remains unable to earn more than

60% of his Predisability Earnings ("**PDE**") from any Employer in the Local Economy at any

gainful occupation for which  **STOUT** is reasonably qualified, taking into account his training,

education and experience, as defined in the Plan, due to his past and ongoing medical condition.

28.  **STOUT**'s **PDE** was $114,110.76 annually, or $9,509.23 monthly.  **METLIFE** has

never identified any gainful occupation in the Local Economy for which **STOUT** is reasonably

qualified, taking into account his training, education and experience, due to his past and ongoing

medical condition, where **STOUT** can earn at least 60% of his PreDisability Earnings.

29.  The record reflects that Glenn M. Hebert, MRC, LRC issued a report that no

comparable employment existed in the Lafayette-Youngsville economic area, and by reason of

his training, education and experience, **STOUT** was only capable of earning annually in the

$22,000-$24,000 range.   The record reflects that **METLIFE** did contract with Corvel

Corporation to perform a Labor Market Survey. The Labor Market Survey (**"LMS"**) conducted

by Corvel in the Local Economy indicated **STOUT**'s previous training and job experience

required lifting greater than 25 lbs. as a job requirement in every employment opportunity

identified in the **METLIFE** commissioned LMS.

30.    The Claims Activity File of MetLife also indicates that **METLIFE** in-house vocational rehabilitation consultants who worked the **STOUT** case from the initial Short Term Disability claim beginning August 8, 2011, through the Long Term Disability Elimination Period ending February 5, 2014, also concluded that there was no gainful employment identified in the Local Economy where **STOUT** could earn 60% of his Predisability Earnings ("**PDE**") or $5,705.54.

31.    Notwithstanding the prior finding, and that **STOUT**'S ongoing medical condition remained essentially unchanged since the Initial Appeal determination, on September 3, 2021, **STOUT**'s long term disability benefits were terminated by **METLIFE** and **NICOLE MARTIN,** without performing any new **LMS** in support of MetLife's determination to terminate **STOUT**'s disability benefits.

32.    The **METLIFE** Medical Director's opinion in **Claims Activity File** indicated that, "***A Labor Market Survey was able to identify similar position with employers with in the local economy with commensurate wages; however the physical requirements of the occupations the EE is qualified for exceed his clinically supported restrictions.***"

33.    Further, the **METLIFE** LTD Claims Activity File has numerous notations that: (a) the carrying and lifting restrictions are supported by the medical records and assessments, (b) the carrying and lifting restrictions are essentially permanent, and ( c ) that any medical improvement of  **STOUT**'s heart condition would **<u>NOT</u>** be a green light to resume the strenuous aggravating activities involving lifting and carrying over 25 pounds.

34.    From November 28, 2014 through September 3, 2021, a period of almost seven (7) years, MetLife paid long term disability payments in the amount of $5,705.54 monthly.

**SECOND TERMINATION OF BENEFITS (SEVEN YEARS LATER)**

35.   By letter dated September 3, 2021 ("**Second Termination of Benefits Letter**" of

"**2ndTBL**") from Metropolitan Life Insurance Company ("**MetLife**"), Claims Specialist

**MARTIN** notified **STOUT** that the benefits being paid to him were henceforth terminated for

the reasons specified in the letter of that date.

36.   The **2ndTBL** letter asserts reasons, albeit insufficient reasons, for the LTD benefits

termination, and **STOUT** appealed the September 3, 2021 termination of his benefits.  **STOUT**

timely filed an appeal on December 16, 2021, in accordance with the instructions set forth in the

correspondence of Claims Specialist **MARTIN**.   The appeal instructions of MARTIN were

flawed, inasmuch as the appeal of a termination of benefits decision should  have been to the

Plan Administrator SMITH, since the September 3, 2021 termination of his benefits by MARTIN

was NOT an Initial Determination as explained in the Plan. .

37.   Reports and records of the treating physician Dr. Esmond Barker indicated on

September 3, 2021, and continue to indicate that Charles **STOUT** remains "disabled" under the

definition of "Disability" as provided in the SMITH LTD Plan, namely that after the Elimination

Period, **STOUT** remained unable to earn more than 60% of his Predisability Earnings ("**PDE**")

from any Employer in the Local Economy at any gainful occupation for which **STOUT** is

reasonably qualified, taking into account his training, education and experience, as well as the

consequential limitations of his serious heart condition.

38.   **STOUT**'s PDE was $9,509.23 monthly.   Glenn M. Hebert, MRC, LRC last report

in the Claims Activity File indicated that no comparable employment exists in the Lafayette-

Youngsville economic area.   The lifting and carrying restrictions were acknowledged in the

MetLife Claims Activity File by the MetLife.   The MetLife in-house vocational rehabilitation

consultants also agreed with the restrictions and limitations.

39.   In order to assess whether **STOUT** could be employed earning more than 60% of his Predisability Earnings ("**PDE**") from any Employer in the Local Economy at any gainful occupation for which  **STOUT** is reasonably qualified, taking into account his training, education and experience, MetLife contracted with Corvel Corp. to perform a **Labor Market Survey ("LMS")**. [12]

40.   The Corvel LMS concluded that employment which met the criteria for Charles **STOUT**'s previous training and job experience required lifting greater than 25 lbs. as a job requirement.  No employment opportunities were identified then or since in the Local Economy for any employment which suited **STOUT** by reason of his training or experience where **STOUT** would earn at least 60% of his Predisability Earnings.   MetLife did not thereafter perform any type of updated LMS to determine whether the initial LMS was outdated.

41.   At all times pertinent herein, **NICOLE MARTIN** ("**Martin**") was employed by **METROPOLITAN LIFE INSURANCE COMPANY ("MetLife")** as a claims adjustor, and at all pertinent times set forth herein was authorized by **METLIFE** to act upon **METLIFE**'s behalf.  **MARTIN** authored a letter dated September 3, 2021, on behalf of **METLIFE**, which declared that **STOUT**'s long term disability benefits were being terminated by **METLIFE**.   The letter stated, **"We have determined that we are unable to approve benefits on your claim beyond September 5, 2021 because a review of your clinical information suggests that you no longer suffer from a medical condition or combination of conditions of such severity that would warrant the placement of restrictions and/or limitations on your activities at this time."**

---

[12] MetLife Claims Activity File, pp. 212-215.

42.   **MARTIN** opined in the September 3, 2021, letter terminating benefits, **"...the medical documentation which we have reviewed indicates that your cardiovascular condition has improved.  The improvements are enough that you do not presently have a significant cardiac dysfunction and there is no longer a medical need for previously assigned restrictions and limitations.   At present, there is nothing within your medical record that would prohibit you from returning to full time work."**   **MARTIN** disregarded the Plan terms that only gave **METLIFE** discretionary authority to make eligibility determinations for long term disability benefits on the "**Initial Determination**" of benefits eligibility.

43.   **MARTIN**, in the September 3, 2021, authored the second termination of benefits letter which stated **MARTIN's** impression of the latest reports of **STOUTs'** treating physician, and that **STOUT**'s hypertension, valvular heart disease, pulmonary hypertension, obstructive apnea, hyperlipidemia showed "*improvement*."   **MARTIN**'s impression disregarded the prior opinions of **METLIFE** Medical Directors written in the **METLIFE** Claims Activity File that periodic "improvement" of **STOUT**'s cardiac condition did not justify modification of the restrictions and limitations imposed by the treating physician.  STOUT's return to heavy rated employment would simply re-aggravate the cardiac condition, according to the **METLIFE** Claims Activity File.

44.   The **MARTIN** letter of September 3, 2021, revealed that the treating physician still opined **STOUT** "*was unable to return to work in [his] previous occupation.*"   **MARTIN** employed Dr. Stanley Chou who opined that **STOUT** could return to some kind of full time employment.   Return to some type of full time employment does not meet nor defeat the Plan's definition of "*Disability*" in the Plan, as the term "*Disability*" as defined contains an economic

component and threshold.

45.    The MetLife Claim Activity File on July 21, 2021,[13] attributes the following to

**MARTIN**, to-wit:

> "*As the assigned LTD Claim Specialist, I am solely responsible for the decision*
>
> *on this claim.  I am requesting review of the available medical information from an*
>
> *enabling support clinical or vocational resource to determine the claimant?s (sic)*
>
> *limitations and restrictions to use as one of the over-arching responsibility to*
>
> *determine the claimant?s (sic) eligibility for LTD benefits under the LTD contract.*"

46.    The September 3, 2021, letter from **MARTIN**  recited the definition of "Disability"

under the Plan, which includes a monetary element, namely: "**You are unable to earn (after the**

**Elimination Period) more than 60% of your Predisability Earnings from any employer in**

**your Local Economy at any gainful occupation for which You are reasonably qualified**

**taking into account Your training, education and experience.**"

47.    Without any reference to a Labor Market Survey, **METLIFE**, through **MARTIN**,

terminated **STOUT**'s long term disability benefits under the Plan without having identified any

gainful employment for which **STOUT** was qualified by reason of his training, education and

experience to earn more than 60% of  Stout's Pre-Disability Earnings ("PDE") ($9,509.23

monthly) [14] as required under the **SMITH** Plan and the MetLife Certificate of Insurance.   The

MetLife Claim Activity File records that on September 2, 2021, **MARTIN** wrote:   "**Counsel**

**wanted to know what we were saying he [Stout] could do.  I told him I did not have that**

---

[13]  MetLife Claim Activity File page 315/336.

[14]  Sixty percent (60%) of PDE equals $5,705.54 monthly.

**information."** [15]

48.   **MARTIN**'s September 3, 2021, termination of benefits letter was authored by **METLIFE**'s representative WITHOUT (a) having an unbiased physician examine or perform cardiac tests upon Stout; (b)  performing any new Labor Market Survey to determine the availability of employment in Local Economy, as required under the **METLIFE** Group Policy definition of "Disability," and whether the employment met the economic threshold as therein defined; and, ( c) evidence  **STOUT** would earn at least 60% of his Predisability Earnings. **STOUT**'s ability to perform "some kind of full-time employment" does not disqualify **STOUT**'s eligibility from long term disability benefits under the specific terms and conditions of the MetLife Policy nor the Plan terms.   "Gainful employment" under the Plan terms must meet the "Disability" economic threshold at least 60% of his Predisability Earnings.

49.   Further, the **METLIFE** Medical Director's opinion in the Claims Activity File indicates that, "*A Labor Market Survey was able to identify similar position with employers with in the local economy with commensurate wages; however the physical requirements of the occupations the EE is qualified for exceed his clinically supported restrictions.*

50.   At all times pertinent herein, **AMY O'CONNER** ("**O'CONNER**") was employed by **METROPOLITAN LIFE INSURANCE COMPANY ("MetLife")** as an appeal specialist, and at all pertinent times set forth herein, **O'CONNER** represented that she was authorized by MetLife to act under the terms of the Plan.   The Plan provides, "**MetLife will conduct a full and fair review of the [appeal].  Deference will not be given to the initial denial, and MetLife's review will look at the claim anew.**"   The Plan terms do not provide for a **new** look at the claim by **METLIFE**.

---

[15]  MetLife Claim Activity File page 332/336.

51.    The Plan did not provide discretion to **METLIFE** to re-litigate the Initial Appeal (which reversed MetLife's Initial Determination of eligibility under the Plan).  **O'CONNER** obviously was either negligent in reading the Plan terms or chose to disregard the express terms of the Plan in deference to MARTIN's claim termination determination of September 3, 2021. **O'CONNER** failed to overrule the actions of **MARTIN** on appeal.  **O'CONNER**'s affirmation of the termination of LTD benefits constitutes a violation of the Plan terms.

52.    The Plan did <u>not</u> delegate to **METLIFE** authority to act as the Plan administrator in terminating ERISA benefits or reviewing decisions to terminate Plan benefits.    Further, the Plan terms only gave **METLIFE** authority to interpret the Plan terms or determine Plan eligibility in the "Initial Determination" of LTD benefits.

53.    The 2ndTBL letter dated September 3, 2021, was considered by **O'CONNER**, and the facts and opinions of  **MARTIN** in terminating benefits were given deference in direct contravention to the Plan terms, which only allow **METLIFE** discretion on the "Initial Claim Determination."

54.    On February 11, 2022, **O'CONNER** rendered a written appeal decision which stated:  "***For the reasons detailed below, we are upholding the termination of [Stout's] claim based on our conclusion that [Stout] does not satisfy the requirements of the plan referenced above (the Plan).***"  The appeal decision further provides, "***We have determined that we are unable to approve benefits on [Stout's] claim beyond September 6, 2021 because your client did not continue to meet the definition of disability.  We have examined [Stout's] <u>entire claim file</u>*** (emphasis added) and *** have determined the available medical information did not support restrictions and limitations which would have prevented [Stout] from performing any gainful occupation for any employer in his local economy, as of September 7, 2021.***"

55.     The appeal decision attributed to **O'CONNER** noted, **STOUT** "***...ceased working as an LWD Operator on August 8, 2011 due to mitral valve regurgitation, aortic regurgitation, chest discomfort, obstructive sleep apnea, thoracic aortic aneurysm, hyperlipidemia, obesity, hypertension, dyspnea on exertion and valvular heart disease. [Stout through counsel] was advised by letter dated September 3, 2021 that his claim had been terminated because medical documentation did not continue to support the definition of disability.***"

56.     **O'CONNER**'s appeal decision acknowledged **STOUT** timely filed an appeal on December 22, 2021, in response to **MARTIN**'s termination of benefits.

57.     **O'CONNER**'s appeal decision also acknowledged counsel for **STOUT** objected to consideration of new evidence on appeal, and that an appeal of the termination effective September 7, 2021, of long term disability benefits should be limited to the evidence in the claim file which was utilized by **MARTIN** in making the determination.   Notwithstanding, **O'CONNER** hired a medical consultant to provide **O'CONNER** with a wholly new medical opinion, which was considered and given preference by **O'CONNER** relating to the ongoing lifting and carrying restrictions assigned to **STOUT**'s cardiac condition by his treating physician. The medical consultant, which **O'CONNER** referred to as an "Independent Physician Consultant (IPC)," who was unidentified in the appeal decision, apparently rendered a report to **O'CONNER** dated January 20, 2022.   This Independent Physician Consultant (IPC), apparently served as a basis of **O'CONNER**'s appeal decision in violation to the terms of the Plan.

58.     Despite the fact that **O'CONNER**'s appeal decision claimed to have *"... examined [Stout's] entire claim fi*le...", the appeal decision ignored and disregarded the MetLife Medical Director's notes and opinion in the MetLife Claims Activity file.   The MetLife Medical Director opined that one of the purposes of refraining from lifting and carrying was so that **STOUT**'s

cardiac condition would in fact improve, rather than being aggravated.   Moreover, the lifting and carrying restrictions assigned to **STOUT**'s cardiac condition by his treating physician was also supported by the MetLife Medical Director's notes and opinion in the MetLife Claims Activity file.

59.   Moreover, the appeal decision completely ignored one element of the definition of "Disability" as defined by the Plan: namely that:  "**You are unable to earn (after the Elimination Period) more than 60% of your Predisability Earnings from any employer in your Local Economy at any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.**"

60.   Neither **MARTIN** nor **O'CONNER** made any reference to the prior Labor Market Survey ("LMS") nor referenced any new LMS differing from the Corvel LMS used in the Initial Claim Determination.   The Plan terms require the identification of gainful employment for which **STOUT** was qualified by reason of his training, education and experience **AND** only where **STOUT** could earn at least 60% of  **STOUT**'s Pre-Disability Earnings ("PDE").  In fact, in examining the entire claims file, both **MARTIN** and **O'CONNER** would have and should have considered and recognize the following:

A.   The report of Glenn M. Hebert, MRC, LRC.

B.   Aortic valve replacement surgery was not recommended.

C.   The treating physician recommended that  Stout not engage in strenuous employment activities that involve lifting or carrying in excess of 25 pounds.

D.   The overall medical aim of the restrictions and limitations namely – avoid the strenuous carrying and lifting activities with the goal of decreasing the severity of the medical problem, and if the condition became better by implementation of that restriction/limitation, then

still avoid lifting and carrying in excess of 25 lbs. so as not to re-aggravate the heart condition.

E.   The MetLife Medical Director's Claims Activity File notes that indicate **STOUT**'s disability was essentially permanent.

F.    The Corvel Corp. Labor Market Survey in the Local Economy finding that all available positions which met the criteria for **STOUT**'s previous training and job experience required lifting greater than 25 lbs.

G.  And the conclusion of **METLIFE** representative Peggy A. Martin in Initial Appeal correspondence, ***"The information we received establishes that he [Stout] remains disabled as defined in his employer's group disability plan; therefor, we have reinstated Mr. Stout's claim effective February 6, 2014.***"

61.   Instead, in contravention to the Plan terms, **O'CONNER** hired a consultant for the express purposes of superceding the facts contained in the **METLIFE** Claims File, and superimposing the opinion of the so-called "Independent Physician Consultant (IPC)," unidentified in the appeal decision, who apparently rendered a personal report to **O'CONNER** on appeal.  The so-called IPC was dated January 20, 2022, <u>after</u> the termination of benefits by **MARTIN**, and <u>after</u> the deadline imposed by **METLIFE** for **STOUT** to file the "appeal." Essentially, **METLIFE** was manufacturing new evidence to be considered in the appeal <u>after</u> **METLIFE** appeal deadlines had expired.

62.   Further, **O'CONNER**'s appeal decision dated February 11, 2022, misstated the criteria for "Disability" as defined and contained in the Plan.   **O'CONNER**'s decision stated a totally new and different criteria:  The "**...file failed to provide clinical evidence in support of a physical functional impairment that would have precluded him from performing any gainful occupation for any employer in his local economy as of September 7, 2021.**"   The

term "**Physical Functional Impairment**" is **NOT** a term defined or utilized in the **SMITH** Plan,

and the above conclusion of **O'CONNER** in the appeal is also flawed for that reason.  The term

"**Physical Functional Impairment**" was a term utilized by the IPC, but which has no meaning

or value under the Plan term in determining eligibility for LTD benefits.

63.   Moreover, **O'CONNER**, apparently relying on an outside consultant **O'CONNER**

personally hired specifically for purposes of her appeal determination (and who did <u>not</u> perform

any physical examination of **STOUT**), concluded that **STOUT** had "no severe physical

examination findings impairing [Stout's] full-functionality in a work setting."  "Full

functionality" is not a term defined nor significant in determining "Disability" as defined and

utilized in "***The Smith International, Inc. Long Term Disability Plan for All Full Time***

***Rotational Employees***."

64.   **O'CONNER**'s appeal decision dated February 11, 2022, did not properly take into

account the the specific language and elements of the term "Disability" as specifically defined

under the terms of the Plan.   **O'CONNER** failed to consider evidence contained in the record.

**O'CONNER** deferred to the conclusions of **MARTIN**.  **O'CONNER** considered evidence **<u>not</u>**

in the record at the time of **MARTIN**'s termination of benefits to **STOUT**.  The definition and

elements of the term "Disability" was intentionally disregarded or ignored by **O'CONNER**.

65.   **O'CONNER**'s appeal decision dated February 11, 2022, states that, "We relied

upon the Plan Documents in making this benefit decision."   Despite the declaration,

**O'CONNER** did not actual reference Plan terms in her decision.

66.   **O'CONNER**'s appeal decision dated February 11, 2022, indicates the last date to file

a civil suit under 29 U.S.C. 1132(a) and under the Plan is February 12, 2025.   Therefore, this

complaint is timely filed.

## RELEVANT PRIOR JUDICIAL ADMISSIONS

67.   In **Stout v. Pathfinder Energy Servs. LLC**, 2015 U.S. Dist. LEXIS 67855, 2015 WL 3413328, it has been judicially admitted that Smith International, Inc. ("Smith") established "The Smith International, Inc. Long Term Disability Plan for All Full Time Rotational Employees," an employee welfare benefit plan (the "Plan"), to provide long term disability benefits to its eligible employees and the eligible employees of its subsidiaries. [16]

68.   It is herein averred and was also judicially admitted in that case that Charles R. Stout ("**Stout**"), now age 42, was eligible to and did participate in the Plan. [17]

69.   It is averred and was also judicially admitted that the Plan is governed by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C.§1001-1462 ("ERISA"). [18]

70.   Further, it was judicially admitted that on or about August 22, 2011, Stout ceased working as a consequence of an aortic valve disorder, [19] and other cardiac medical problems.

71.   It has been judicially established Stout applied for an was granted Long Term Disability benefits under the Plan commencing February 6, 2012. [20]

---

[16] "Charles Robert Stout v. Pathfinder Energy Services, LLC et al, Case 6:14-cv-02457-RTH-CMH, Document 28-4, Page ID # 316, Paragraph No. 1.

[17] "Charles Robert Stout v. Pathfinder Energy Services, LLC et al, Case 6:14-cv-02457-RTH-CMH, Document 28-4, Page ID # 316, Paragraph No. 3.

[18] "Charles Robert Stout v. Pathfinder Energy Services, LLC et al, Case 6:14-cv-02457-RTH-CMH, Document 28-4, Page ID # 316, Paragraph No. 2.

[19] "Charles Robert Stout v. Pathfinder Energy Services, LLC et al, Case 6:14-cv-02457-RTH-CMH, Document 28-4, Page ID # 316, Paragraph No. 4.

[20] "Charles Robert Stout v. Pathfinder Energy Services, LLC et al, Case 6:14-cv-02457-RTH-CMH, Document 28-4, Page ID # 316, Paragraph No. 5.

## FIRST CAUSE OF ACTION

72.   Plaintiff **STOUT** incorporates all preceding paragraphs as if fully re-alleged herein, to the extent they are not inconsistent with allegations contained in the First Cause of Action. Incorporating all of the allegations of fact pleaded in the preceding paragraphs, **STOUT** brings this civil action under the provisions of 29 USCS § 1132(a)(1)(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, and/or to clarify his rights to future benefits under the terms of the plan.   **STOUT** seeks payment of retroactive LTD benefits owed to him under the Plan, prejudgment interest, attorney's fees, and costs, and  a declaration of his continued eligibility for **LTD** benefits under the Plan until he reaches the age of 65 years or otherwise set forth in the Plan terms.

73.   By letter dated February 21, 2014, **METLIFE** advised Stout that his claim for long term disability benefits was to be terminated effective February 5, 2014, "...because you no longer satisfy the definition of disability your employer's Plan." [21]   On August 22, 2014, Stout requested an administrative appeal of the termination of the long term disability benefits. [22] Under the terms of the **SMITH** Plan, this termination of benefits by **METLIFE** constituted an "Initial Claim" eligibility determination as set forth in the Plan documents.

74.   Notwithstanding the Initial Denial of Benefits by **METLIFE**, by correspondence from MetLife Appeals Specialist Karen VanAernam, on November 5, 2014, **STOUT** was advised that, "***...a thorough review of your client's claim [for long term disability benefits due to a cardiac problem] was completed by the MetLife Disability Appeals department.  It has***

---

[21]   "Charles Robert Stout v. Pathfinder Energy Services, LLC et al, Case 6:14-cv-02457-RTH-CMH, Document 28-3, Exhibit B, Page ID # 312;

[22]   "Charles Robert Stout v. Pathfinder Energy Services, LLC et al, Case 6:14-cv-02457-RTH-CMH, Document 28-4, Page ID # 317, Paragraph No. 8.

***been determined that the previous claims decision has been <u>reversed</u> and Mr. Stout's benefits***

***will be <u>reinstated</u>.*** (emphasis added)  ***The file has been returned to the claims team to adjust the***

***claim accordingly.***" [23]

75.    The Plan does not provide for determinations or appeals by **METLIFE** after the

"***Initial Determination***" for purposes of re-evaluating or re-determining the eligibility for a

participant for long-term disability benefits under the Plan.  Subsequent eligibility evaluations

and/or interpretation of Plan terms is reserved to the Plan Administrator **SMITH** under the terms

of the Plan.

76.   The Plan provides that in carrying out their respective responsibilities under the

Plan, the Plan administrator **SMITH** shall have discretionary authority to interpret the terms of

the Plan and to determine eligibility of Plan benefits in accordance with the terms of the Plan.

**METLIFE** was <u>not</u> given discretionary authority to interpret the terms of the Plan.  Further,

under the terms of the Plan, MetLife was given only discretion in the "Initial Determination" for

benefits eligibility, and in the appeal of the "Initial Determination."  After the initial

determination and appeal thereof, the Plan administrator Smith International, Inc. has discretion

in making interpretations of plan terms and eligibility determinations.

77.   **METLIFE, MARTIN** and **O'CONNER** exceeded their lawful authority under the

express terms of ***The Smith International, Inc. Long Term Disability Plan for All Full Time***

***Rotational Employees*** in A) interpreting the Plan terms (to allow termination or modification

benefits beyond the initial determination and appeal), and B) denying eligibility for long-term

disability benefits to **STOUT** subsequent to the initial determination and appeal.

_____

[23] "Charles Robert Stout v. Pathfinder Energy Services, LLC et al, Case 6:14-cv-02457-RTH-CMH, Document 28-4, Page ID # 317, Paragraph No. 9; and, Document 28-3, Page ID # 314, Exhibit C.

78.   **SMITH INTERNATIONAL, INC.**  did not interpret the Plan to allow **METLIFE** a subsequent opportunity to terminate long-term disability benefits to **STOUT**, nor did **SMITH** take any action to deny eligibility for long-term disability benefits after **METLIFE**'s reversal of the Initial Determination and subsequent reinstatement of **STOUT**'s benefits on appeal.  By correspondence dated November 5, 2014, after the Initial Appeal to **METLIFE**, the **METLIFE** appeals specialist **_reversed_** the Initial Claim termination decision.

79.   **STOUT** is entitled to long-term disability benefits in the amount of $5,705.54 from September 7, 2021, to the date of judgment, plus judicial interest from that date, and reasonable attorney fees in the amount of twenty-five (25%) of all amounts due and owing by defendants.

## SECOND CAUSE OF ACTION

80.    Plaintiff **STOUT** incorporates all preceding paragraphs as if fully re-alleged herein, to the extent they are not inconsistent with allegations contained in the Second Cause of Action. Incorporating all of the allegations of fact pleaded in the preceding paragraphs, **STOUT** brings this civil action under the provisions of 29 USCS § 1132(a)(1)(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, and/or to clarify his rights to future benefits under the terms of the plan.

81.    Plaintiff **STOUT** brings this action against **NICOLE MARTIN,** believed to have been at all times pertinent herein, an employee and/or representative of **METLIFE**, who without properly consulting and adhering to the terms and conditions of the "***The Smith International, Inc. Long Term Disability Plan for All Full Time Rotational Employees***," the prior opinions expressed by the MetLife Medical Director, and without considering the medical evidence on hand from the treating physician, and in bad faith, intentionally and/or negligently deprived **STOUT** as a Plan participant to his rights under the Plan and under the provisions of 29 USCS §

1132(a)(1)(B) to recover LTD benefits due to him under the terms of the Plan.

82.   Further, **MARTIN** terminated the rightful LTD benefits due and owing to **STOUT** as a Plan participant contrary to the Plan terms, including but not limited to:

A.   Failing to consider that **STOUT** prevailed on his "Initial Appeal" and that **METLIFE** reversed the Initial Determination on the same or similar grounds.

B.   Failing to consider the professional opinions of the MetLife Medical Director as expressed in the MetLife Claims Activity File.

C.   Failing to consider the long-standing findings, diagnostic tests and other medical evidence of S**TOUT**'s treating physician Dr. Esmond Barker.

D.    Failing to take into account the latest **METLIFE** Labor Market Survey conducted for the sole purpose of determining whether **STOUT** could be employed at any gainful employment for which he was qualified making at least 60% of **STOUT**'s PreDisability Earnings.

E.   Failing to take into account the latest **METLIFE** in-house vocational reports which are found in the MetLife Claims Activity File.

F.   Willfully violating the terms of the Plan and the terms of the MetLife Certificate of Insurance which was specifically included as part of the **SMITH** Plan.

83.   At no pertinent time did **MARTIN** have the authority of **SMITH**, as Plan Administrator, to interpret the Plan terms.

84.   At no pertinent time did **MARTIN** have the authority of **SMITH**, as Plan Administrator, to terminate the eligibility of **STOUT** to benefits under the Plan terms.

### THIRD CAUSE OF ACTION

85.    Plaintiff **STOUT** incorporates all preceding paragraphs as if fully re-alleged herein,

to the extent they are not inconsistent with allegations contained in the Third Cause of Action. Incorporating all of the allegations of fact pleaded in the preceding paragraphs, **STOUT** brings this civil action under the provisions of 29 USCS § 1132(a)(1)(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, and/or to clarify his rights to future benefits under the terms of the plan.

86.   Plaintiff **STOUT** brings this action against **AMY O'CONNER,** believed to have been at all times pertinent herein, an employee and/or representative of **METLIFE**, who without properly consulting with the terms and conditions of the "***The Smith International, Inc. Long Term Disability Plan for All Full Time Rotational Employees***," the opinions of the MetLife Medical Director(s), and without considering the medical evidence on hand, and in bad faith, intentionally and/or negligently deprived **STOUT** as a Plan participant to his rights under the Plan and under the provisions of 29 USCS § 1132(a)(1)(B) to recover LTD benefits due to him under the terms of the Plan.

87.   Further, **O'CONNER** failed to properly consider the Plan terms in reviewing the decision of **MARTIN** to terminate LTD benefits under the terms of the Plan, including but not limited to:

A.   Failing to consider that **STOUT** prevailed on his Initial Appeal and that **METLIFE** reversed the Initial Determination on the same or similar grounds.

B.   Failing to consider the professional opinions of the MetLife Medical Director as expressed in the MetLife Claims Activity File upholding the limitations and restrictions placed upon **STOUT** due to his past and ongoing medical and physical condition.

C.   Failing to consider the long-standing findings, diagnostic tests and other medical evidence of **STOUT**'s treating physician Dr. Barker which was supposedly reviewed on appeal.

D.   Failing to take into account the latest **METLIFE** Labor Market Survey conducted for the sole purpose of determining whether **STOUT** could be employed at any gainful employment for which he was qualified making at least 60% of **STOUT**'s PreDisability Earnings which was supposedly reviewed on appeal.

E.   Failing to take into account the latest **METLIFE** in-house vocational reports which are found in the MetLife Claims Activity File which was supposedly reviewed on appeal.

F.   Willfully violating the terms of the Plan and the terms of the MetLife Certificate of Insurance, which was specifically included as part of the Smith Plan.

88.   At no pertinent time did **O'CONNER** have the authority of **SMITH**, as Plan Administrator, to interpret the Plan terms.

89.   At no pertinent time did **O'CONNER**  have the authority of **SMITH**, as Plan Administrator, to conduct a second and subsequent appeal of the termination of benefits by **MARTIN**, which decision to terminate LTD benefits under the Plan terms was "reversed" on the Initial Appeal contemplated under the Plan terms.

90.   **O'CONNER** usurped the power and authority of **SMITH** as Plan Administrator under the terms of the Plan, to approve on appeal an interpretation of Plan terms in contravention to the terms of the Plan which gave only **SMITH** the power to interpret Plan terms beyond the Initial Appeal.

91.   **O'CONNER** usurped the power and authority of **SMITH** as Plan Administrator under the terms of the Plan, to affirm on appeal a subsequent termination of LTD benefits by **NICOLE MARTIN** in contravention to the terms of the Plan which gave only **SMITH** the power to determine eligibility under the Plan terms beyond the Initial Claim Determination.  At no pertinent time did **O'CONNER** have the authority of **SMITH**, as Plan Administrator, to

affirm the termination of **STOUT**'s previously awarded LTD benefits under the Plan terms.

**FOURTH CAUSE OF ACTION**

92.   Plaintiff **STOUT** incorporates all preceding paragraphs as if fully re-alleged herein, to the extent they are not inconsistent with allegations contained in the Fourth Cause of Action. Incorporating all of the allegations of fact pleaded in the preceding paragraphs, **STOUT** brings this civil action under the provisions of 29 USCS § 1132(g)  to recover judicial interest, costs and attorney fees.

**FIFTH CAUSE OF ACTION**

93.   Plaintiff **STOUT** incorporates all preceding paragraphs as if fully re-alleged herein, to the extent they are not inconsistent with allegations contained in the Fourth Cause of Action. Incorporating all of the allegations of fact pleaded in the preceding paragraphs, **STOUT** as a Plan participant, brings this civil action under the provisions of 29 USCS § 1132(a)(1)(B) against **SMITH** as Plan Administrator to enforce **STOUT**'s rights under the Plan and under the provisions of 29 USCS § 1132(a)(1)(B) to recover LTD benefits due to him under the terms of the Plan.

94.   **SMITH,** as Plan Administrator, owes to **STOUT** fiduciary duties to assure that the Plan terms are properly interpreted and construed, including the eligibility for LTD benefits at any time beyond the Initial Claim Determination and Initial Appeal, and has a duty to overrule any insurer who may usurp **SMITH**'s authority and discretion under the terms of the Plan.

95.   **SMITH,** as Plan Administrator, failed to enforce the terms of the Plan to the detriment of **STOUT**, abandoning its fiduciary duties and responsibilities to **STOUT** and other similarly situated Plan participants who are owed fiduciary duties under the Plan.

## SIXTH CAUSE OF ACTION

96.   Plaintiff **STOUT** incorporates all preceding paragraphs as if fully re-alleged herein.

In addition to the causes of action set forth herein, **STOUT** prays for a declaratory judgment that

the LTD benefits under the Plan shall be due and payable monthly in the amount of sixty percent

(60%) of **STOUT**'s PDE, which benefits should not be terminated by **SMITH** and/or

**METLIFE**, until the <u>expiration</u> of **STOUT**'s LTD benefits which are due and owing under the

terms and for the periods of time  specifically set forth in Plan.

WHEREFORE, **CHARLES ROBERT STOUT** prays for judgment consistent with the

relief as set forth in 29 U.S.C. 1132 and the facts alleged in this complaint.

Respectfully submitted,

*/s/ J. Lomax Jordan, Jr.*
J. Lomax Jordan, Jr. (Bar No.07518)
1817 W. University Avenue
Lafayette, LA 70506
Phone: (337) 233-9984
maxjordan.cox@gmail.com and
maxjordanlaw@lusfiber.net
Counsel for Plaintiff, Charles R. Stout